NOTICE

Decision filed 03/07/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210076-U

NO. 5-21-0076

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-825 |
| | ) | |
| MICHAEL A. WEIS, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In this direct appeal, the defendant's eight convictions and sentences are affirmed, because the trial judge did not err when she (1) denied the defendant's third motion to suppress evidence, (2) denied his January 31, 2020, motion to dismiss for lack of a speedy trial, (3) granted the State's motion to bar evidence of certain phone calls and texts that the defendant maintains should have been admitted, (4) denied the defendant's motion *in limine* that attempted to bar evidence of his extramarital affairs, (5) allowed at trial evidence of one of his extramarital affairs, while denying video evidence and other evidence about the victim that the defendant wished to introduce, and (6) allowed evidence on the charges of child pornography that the defendant was being tried upon.

¶ 2    The defendant, Michael A. Weis, appeals his eight convictions and sentences, after a trial by jury in the circuit court of Madison County. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    We present only those facts necessary to our disposition of this appeal, which are as follows. On April 6, 2017, the defendant, who was born in May 1981, was charged, by amended

1

information, as follows: count I alleged that the defendant committed aggravated criminal sexual abuse, with the offending conduct being that he "fondled the sex organ of K.S.," who was born in October 2003; count II alleged a second offense of aggravated criminal sexual abuse, with the offending conduct in this count being that he "rubbed the breast of K.S."; count III alleged that the defendant committed criminal sexual assault, with the offending conduct being that he "inserted his penis into the sex organ of K.S."; count IV alleged a second offense of criminal sexual assault, with the offending conduct in this count again being that he "inserted his penis into the sex organ of K.S."; and count V alleged a third offense of criminal sexual assault, with the offending conduct in this count being that he "inserted his penis into the mouth of K.S." All of the charged offenses were alleged to have occurred between January 1, 2017, and March 20, 2017, when K.S. was 13 years old.

¶ 5    On June 26, 2017, the defendant filed a motion to suppress evidence. A hearing on the motion was set for August 10, 2017. By agreement of the parties, the hearing was subsequently moved to August 29, 2017. At the hearing, the defendant contended, as he did in his written motion, that, *inter alia*, the March 21, 2017, search warrant granted to the Granite City Police Department to search certain of the defendant's possessions was limited in scope to items reasonably related to the defendant's service as a member of the Granite City auxiliary police department, and that the seizure of certain other items—including his cellular telephone and some computer equipment—was beyond the scope of the warrant. He also argued that the phone was not "obvious and immediately indicative of a criminal activity of any sort and particularly not of criminal sexual assault," and thus could not be seized under any kind of "plain view" theory.

¶ 6    The State argued that the complaint for the search warrant—which was signed by Judge Schroeder at the same time he signed the warrant—indicated that the State sought "any other evidence or instrumentalities that may be evidence of criminal sexual assault," which the State

argued clearly included the phone and computer equipment. The State contended that the failure to include this language in the warrant "was a clerical error, that it was an oversight that it was not included in the search warrant but that it had been intended to be included and was omitted in error." The State also argued that seizing the phone and computer equipment was consistent with K.S.'s description of some of her contact with the defendant occurring by means of electronic devices such as a phone or computer, and thus the seized items fit squarely into the description of instrumentalities that may contain evidence of the charged crimes and their seizure was supported by probable cause.

¶ 7    In a written order also entered on August 29, 2017, the trial judge stated that she was taking the defendant's motion to suppress under advisement, and was granting the parties 30 days to submit relevant case law. She also ruled that by September 11, 2017, the State was required to provide a written response listing which items that were seized had been examined by the police, and which had not, as well as what items could then be returned to the defendant so that he could prepare his defense. She further ordered that "[c]opies of all downloaded material from computers, cell phones, or any other electronic devices" must be provided to the defendant by September 11, 2017.

¶ 8    Thereafter, most of the electronic equipment in question was returned to the defendant. Additional procedural matters followed, and various continuances of the defendant's trial were entered, with each continuance noting that it was done on the motion of the defendant, with any delay attributed to the defendant. On December 4, 2017, an entry of appearance was filed by an attorney from the firm that continues, through this appeal, to represent the defendant. A speedy trial demand was filed by new counsel on that same day. Throughout the remainder of the record on appeal, many additional continuances of the defendant's trial were entered thereafter, with each

3

continuance noting that it was done on the motion of the defendant, with any delay attributed to the defendant. Continuances that did not so note are described in more detail below.

¶ 9 On March 7, 2018, a hearing was held on some of the then-pending motions. Of relevance to the issues raised by the defendant in this appeal, the defendant's new counsel, at the hearing, renewed prior counsel's motion to suppress evidence, with regard to items still seized by the police. The trial judge granted the motion to suppress with regard to any item not specifically listed in the March 21, 2017, search warrant. She asked defense counsel if that resolved the issues with regard to the motion to suppress. He answered that it did. When thereafter asked if defense counsel had any other matters that needed to be addressed, counsel answered, "I don't remember if we reset this for a future date on just a general trial docket, but it is our intent we are going to be obtaining some expert services so we are not in a rush on this so to speak because I know it is going to take some time for disclosure to be properly made."

¶ 10 On March 22, 2018, the defendant filed a second motion to suppress evidence, which was limited to a "Snapchat picture" that was purportedly recovered from the defendant's phone by police using a "Cellebrite extraction." A hearing on the motion to suppress—as well as on other pending motions—was held on May 31, 2018. At the hearing, Detective Jeff Donahey testified that he had been employed for the last approximately 11 years by the Granite City Police Department, and that he had specialized training making "digital extractions of cell phones." He testified that he had some training with social media applications such as Snapchat. He testified about an error, interpreting who was the recipient of a Snapchat photograph, that he made in his initial forensic report in this case. In argument, the defendant contended that the error in Donahey's report should lead to suppression of the photograph in question. The trial judge disagreed, and denied the motion to suppress the photograph. She noted, however, that if the defendant contested the relevancy of the photograph—which allegedly depicted the defendant having sexual contact

4

with K.S.'s mother, and with another woman, but not with K.S., who was not in the photograph—he could always file a motion *in limine* to attempt to prevent its introduction at trial.

¶ 11    On July 12, 2018, the State filed a motion to bar evidence of phone calls, in which it contended that the defendant purported to have evidence, in the form of text messages, that K.S. made a prank call or calls to the defendant's wife. The State asserted that the prank calls were made by K.S.'s sister, not K.S., and that K.S. texted an apology for her sister's action. The State further asserted that the phone call and text evidence were "irrelevant" to the criminal case against the defendant and should be barred from trial. The trial judge thereafter took the motion under advisement.

¶ 12    On August 8, 2018, the defendant filed a motion *in limine* in which he sought to bar from trial, *inter alia*, "[a]ny mention of [his] extramarital affairs, if any, that may exist." The defendant claimed that any such evidence was irrelevant and was "more prejudicial than probative to any issue in this case." The State argued that evidence of the defendant's sexual relationship with K.S.'s mother was relevant because it provided the context necessary for the jury to understand how the defendant met K.S. and had "access to her." The trial judge thereafter ruled that she would allow only questioning regarding the relationship between the defendant and K.S.'s mother, and would not allow any photographs of sexual relations between the defendant and K.S.'s mother unless any such photographs were "necessary for impeachment or another purpose raised outside the presence of the jury." She stated on the record that she also believed that information about the relationship between K.S.'s mother and the defendant was relevant if K.S.'s mother testified at trial, because it "goes to her credibility on the witness stand, her motive, her bias, her interest."

¶ 13    On August 29, 2018, the defendant filed a motion to bar discovery tendered to the defendant after the final pretrial hearing, or, in the alternative, to continue the trial setting that was scheduled for September 4, 2018. Therein, he stated that the State provided new discovery to the

5

defendant on August 27, 2018, which included a PDF file with "over 14,600 pages of data/images," and which the State informed him purportedly included "at least 3" photos of K.S. that previously had been "hidden in a calculator app" on the defendant's seized cell phone. He stated that the State had informed him that the materials were recovered from the defendant's cell phone, which had been in the police department evidence vault, using "new" Cellebrite software. The defendant contended that the "new" Cellebrite software update had been available for approximately eight months, and that the police could have discovered the evidence, and turned it over to the defense, much sooner if they had employed due diligence. The defendant further stated "that at the time of his arrest [he] voluntarily gave all pin codes and passwords to the police for his cellular devices and Nest accounts. His intent was to allow the police to thoroughly examine all cellular data with the belief that after doing so his name would be cleared." The defendant asked the trial judge to "enter an order barring use of any evidence contained in the supplemental discovery from use at any future hearing or trial due to the lateness of disclosure," and to "enter an order barring the use of such evidence as a sanction against the State for intentionally/negligently disclosing such voluminous evidence only a few days prior to [the scheduled trial date]." He further stated that if the trial judge allowed the "evidence to be introduced at trial," he "request[ed] that the trial be continued to a future date" to allow him to "obtain expert witness services relevant to the data."

¶ 14    Also on August 29, 2018, the trial judge, by docket entry, noted that a hearing had been held on the defendant's motion to bar discovery tendered to the defendant after the final pretrial hearing, or, in the alternative, to continue the trial setting that was scheduled for September 4, 2018. However, the defendant has not provided a transcript of that hearing, or a bystander's report, in the record on appeal. Also in her docket entry, the trial judge denied the defendant's motion to bar the discovery, but granted the defendant's motion to continue the trial, setting a new trial date of September 17, 2018. On that date, the trial judge entered an order that stated that, by agreement,

6

the trial was being reset for October 9, 2018. On September 27, 2018, the defendant moved to continue the trial again, and the trial judge granted the defendant's request.

¶ 15    On October 25, 2018, the defendant was indicted on the original five counts discussed above, as well as three new counts, each of which was for child pornography, and each of which alleged that K.S. was the victim of the count in question. Additional continuances of the defendant's trial were entered thereafter, with each continuance noting that it was done on the motion of the defendant, with any delay attributed to the defendant.

¶ 16    On January 29, 2019, the defendant filed a motion to release evidence for forensic review, in which he contended that the "new charges" found in the indictment were based upon data extracted from his seized cell phone, which the defendant's expert witness needed to access so that the expert could prepare for trial.

¶ 17    Also on January 29, 2019, the defendant filed his third motion to suppress evidence. In the new motion, the defendant contended that he was "arrested" at his place of business in Granite City on March 21, 2017, and was handcuffed. He further contended that he was not given *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), but was nevertheless questioned about "where his security system was located, that it was called a NEST system[,] and that it worked with a cloud software system." He alleged that his cell phone was seized from him, and that it "was equipped with encryption that required a password." He alleged that he was taken to the police department, where he attempted to use a telephone in a holding cell to call his father to ask his father to obtain an attorney to assist him. He alleged that police "deactivated" the phone in the cell, and that after terminating "his attempt to obtain legal counsel to represent him," authorities "began formal questioning of" him. The defendant thereafter alleged the following:

"Prior to being Mirandized, Det. Jeff Donahey questioned the [d]efendant asking him how to unlock his cellular phone (Samsung Galaxy). Detectives asked the [d]efendant for the

7

PIN in an attempt to access the cellular phone. Had the [d]efendant not given them the PIN they would not have been able to access the device's data. Attempts to obtain the data without the PIN would have resulted in the phone having to be 'cracked' per Detective Donahey's conversation with [the d]efendant, and the data being locked and becoming inaccessible to law enforcement."

¶ 18    The defendant further alleged that he, "without advice of counsel, or the benefits of his *Miranda* rights, gave the PIN number to Detective Donahey" and that "detectives used the PIN to gain access to the cellular phone and all the digital data included therein."

¶ 19    With regard to the "new search" of the phone in August 2018, the defendant alleged that this search would have been impossible without his initial revelation of the PIN to police, because the data found during that search "would have been completely locked." He noted that a second search warrant was never obtained, and that the first warrant allowed "a search for only evidence related to criminal sexual abuse, not child pornography." The defendant claimed that the following evidence was obtained "unconstitutionally": (1) verbal statements he made at his business when he was arrested, but had not yet received *Miranda* warnings, (2) his PIN number, "prior to being Mirandized," and (3) all evidence related to the counts that alleged child pornography. He asked for the suppression of this and all related evidence.

¶ 20    A hearing on the defendant's motion was held on March 13, 2019. The defendant's father testified that the defendant called him from the Granite City Police Department. He testified that he had contacted an attorney to represent the defendant after learning that the defendant had been taken into police custody "[a] few hours" before, and that he was about to tell the defendant that an attorney had been retained, when their phone call was terminated "about two minutes" after it began. He could not recall with certainty whether the defendant ever asked him to get an attorney for him. Kari Shipley testified that she was a dispatcher with the Granite City Police Department,

8

and that on March 21, 2017, when the defendant was in a holding cell, she noticed that he was using the telephone in the cell. She testified that a detective told her that the defendant was not allowed to use the telephone, and that Officer Ryan Jones then terminated the phone call.

¶ 21    Detective Donahey testified, as he did at the May 31, 2018, hearing, about his specialized training making digital extractions of cell phones. He testified that on March 21, 2017, he was present with other officers when the defendant's place of business was searched pursuant to a search warrant. He testified that he did not observe any officers give the defendant *Miranda* warnings. He testified that he arrived after other officers "had gotten there," and could not recall if the defendant was handcuffed when he arrived. Donahey testified that he did not recall having a conversation with the defendant about the defendant's PIN number. Eventually, when he accessed the phone to do a Cellebrite search of the phone, he accessed the phone "through a port." He did not recall if he first entered a PIN number. He testified that using a PIN "would have not been completely necessary," but "would have only made it easier." He testified that although he did not remember if he asked the defendant for his PIN number, it was "possible" that he did. When asked, he testified again that he could "get into [the defendant's] phone without the passcode." He agreed that the search warrant for the phone did not specifically authorize him to seize the defendant's PIN number. Donahey testified that he began his search of the phone "[w]ithin one hour" of receiving the phone on March 22, 2017, and that it was his understanding that a "second search occurred in August of 2018."

¶ 22    On cross-examination, Donahey testified that the defendant did not request an attorney during any of the conversations the defendant had with Donahey. He testified that when executing a warrant, it is "common" for him to ask questions to facilitate the execution of the warrant, such as asking for a PIN number to open a garage, rather than having officers break down the garage door without asking, to avoid making things "potentially unusable" after the warrant is executed.

He testified that, in the context of a cell phone, if he were required to remove memory chips from a phone to examine them, the phone "would probably not be operable" if returned to its owner. When asked if he had to "crack" the defendant's cell phone, he testified that with the defendant's model of cell phone—a Samsung 7—he could "bypass the lock" by using the Cellebrite system to "basically just walk[ ] underneath the passcode." On redirect examination, he testified that although he, personally, did not have the technology on March 22, 2017, to bypass the defendant's PIN number using his then-current Cellebrite software, he could have done so "using our site out of Missouri or Cellebrite themselves." He testified as well that there were "multiple techniques that could have been used *** to bypass the lock." He reiterated that he could not recall if he used the defendant's PIN to access the phone or not, but testified, "I would assume that he gave me the PIN code."

¶ 23 Detective Dean Bastilla testified that he had been employed by the Granite City Police Department for approximately 12.5 years. He testified that he did not observe the defendant being read his *Miranda* rights at the defendant's place of business, but that he gave the defendant his *Miranda* rights the following day before conducting a formal interview with him. On cross-examination, he testified that he waited until the following day to interview the defendant because he wanted to first examine the evidence from the defendant's cell phone. He testified that the defendant did not ask him for an attorney prior to the interview. At approximately 20 minutes into the interview, the defendant requested an attorney. Bastilla testified that he did not ask any additional questions after that.

¶ 24 The defendant testified that on March 21, 2017, he was standing outside of his place of business when two police officers approached him, he was immediately handcuffed, and the concealed weapon he was legally carrying was taken from him. He testified that he did not receive *Miranda* warnings at either his place of business or the police department. He testified that his cell

10

phone was taken from him after he was handcuffed, outside of his place of business, and that later, when he was in a holding cell at the police department, Donahey asked him for his PIN number to access the phone. Specifically, the defendant testified that Donahey told him that the police had a search warrant for his phone, and that if Donahey had to "crack" the phone, it would not "be usable again." He testified that Donahey asked, " 'so do you want to give me your PIN number?' " He testified that he "hesitated," and told Donahey that he did not feel comfortable, but that he would give it to Donahey if Donahey needed it and if it would help the defendant get out of the holding cell. He testified that he then provided his "PIN number at that time." He testified that to his knowledge, the phone could not be accessed without the PIN. When asked, he reiterated that he had not received *Miranda* warnings at that time. With regard to his subsequent phone conversation with his father while the defendant was in the holding cell, the defendant testified that he "believe[d]" he was in the "middle" of telling his father he wanted an attorney when the phone call was terminated. On cross-examination, the defendant agreed that he voluntarily gave his PIN to Donahey, and that Donahey did not threaten him or harm him in any way.

¶ 25    Following testimony, the parties agreed to submit argument and case law in writing, and the trial judge indicated that she planned to take the case under advisement. After discussing some of her frustrations with the case to date, she added, "let's be clear, once this motion is ruled on and I rule on the other motion [presently under advisement], this case is going to trial." She then added, "And I am going to push it to the first available date. So I don't care if you have vacations planned. I don't care if you have other trials going. This case is two years old." She further added that, in light of the severity of the charges, "I want it to be clear that we did everything that we were supposed to do in moving this case along and presenting the evidence in a manner that the law requires."

11

¶ 26     The day after the hearing—March 14, 2019—the trial judge filed a docket entry in which she noted that she was taking the motion under advisement as of that date, and that the parties were "given 14 days to submit argument and case law." Additional orders were entered continuing the defendant's jury trial, with each continuance noting that it was done on the motion of the defendant, with any delay attributed to the defendant. On March 27, 2019, the defendant filed a brief in support of the motion to suppress. Also on March 27, 2019, the State filed its response to the defendant's motion to suppress.

¶ 27     On July 2, 2019, a little over three months after the trial judge received the arguments and case law of the parties, the defendant filed a "first supplemental brief in support of [his] motion to suppress," in which he discussed a recently-filed case from our colleagues in the First District of this court. Thereafter, five additional continuances were entered, with the first three noting, as in previous continuance orders in this case, that they were done on the motion of the defendant, with any delays attributed to the defendant. The fourth continuance noted, with an asterisk, "motion to suppress under advisement," and was followed with a checkmark by a box that stated "Said motion does toll speedy trial," and was followed at the bottom with the statement that the defendant "announce[s] ready for trial." The fifth continuance noted, as in previous continuance orders, that it was done on the motion of the defendant, with any delays attributed to the defendant, and with the notation, at the bottom, that the defendant "announces ready for trial."

¶ 28     On November 14, 2019, the State filed a supplemental response to the defendant's motion to suppress, in which it discussed a federal district court case that it believed was relevant to the defendant's motion.

¶ 29     On November 20, 2019, the defendant filed a "first amended motion to suppress evidence." Therein, the defendant argued for the first time that "all searches of the defendant's cellular phone were overbroad and not particular enough to satisfy the fourth amendment." Also on November

20, 2019, the defendant filed a "second supplemental brief in support of [his] motion to suppress evidence." Therein, the defendant cited a 2015 federal district court case that he believed was relevant to his new argument presented in his first amended motion to suppress, and he attempted to distinguish the federal case cited by the State in its November 14, 2019, filing. Thereafter, an order continuing the trial was entered, which noted, as in previous continuance orders, that it was done on the motion of the defendant, with any delays attributed to the defendant, followed on January 13, 2020, by a second order that again continued the trial, but this time did not specify whether the continuance was by agreement or at the request of the defendant, and did not indicate that the delay was attributed to the defendant. This continuance also noted, at the bottom, that the defendant "announces ready for trial."

¶ 30    On January 31, 2020, the defendant filed, *pro se*, a motion to dismiss, in which he contended that his speedy trial rights had been violated. A hearing on his motion was set for April 17, 2020, and additional continuances of his trial were entered. However, in an order filed on April 21, 2020, it was noted that the hearing on the defendant's motion "was cancelled due to COVID-19," and was rescheduled for June of 2020. Ultimately, the hearing was held on June 4, 2020.

¶ 31    At the June 4, 2020, hearing, no testimony was adduced. The parties offered argument, and the trial judge then explained her view of the procedural posture of the case, and resulting delays. She stated that the "motion to dismiss completely ignores the fact that trial orders were entered where the case was continued on the motion of the defendant," as well as continuances by agreement of the parties. She described the motion to dismiss as "not well pled," and inaccurate in light of "the entire court file and all the pleadings that were filed in it." She denied the motion, and likewise denied the motion to suppress, stating that a written ruling would follow. With the agreement of the parties, a tentative trial date of June 15, 2020, was set.

¶ 32    On June 10, 2020, the trial was continued due to an order entered by the chief judge of the circuit, as a result of the COVID-19 pandemic. The trial was reset for August 17, 2020. On June 29, 2020, the State filed an amended motion *in limine*, asking the trial judge to bar, *inter alia*, evidence that while the case was pending, K.S. gave birth to a child. The motion alleged that the father of the child was a juvenile at the time of conception, that no charges were brought against him, and that the birth of the child was irrelevant to the case against the defendant. On July 22, 2020, the trial judge entered an order noting that a hearing had been held that day on the State's amended motion *in limine*, and that the motion was "granted without objection." The defendant has not included a transcript of the hearing, or a bystander's report, in the record on appeal provided to this court. The July 22, 2020, order also noted that pursuant to the administrative order issued regarding COVID-19, the defendant's jury trial was continued until September 21, 2020.

¶ 33    On September 3, 2020, the defendant filed a motion to continue the trial. A hearing on his motion was held on September 9, 2020. At the hearing, the defendant argued that COVID-19 might limit the jury pool in such a manner that he could not get a fair trial. The State objected to the continuance, arguing that the defendant's position was "speculative." The trial judge denied the motion to continue.

¶ 34    On September 18, 2020, the trial judge entered a written order in which she noted that the defendant's *pro se* motion to dismiss was adopted by the defendant's counsel at the previous hearing on the matter, and was denied, with the present order being entered to further explain her ruling. She made the following findings of fact:

> "Over the course of this case, through June 4, 2020, the Court has held over a dozen hearings, dealing with numerous motions, including: three separate motions to suppress evidence and/or statements with hundreds of pages of attachments and supplemental addendums, two motions to dismiss, motions to compel, motion for bill of particulars,

14

multiple motions *in limine*, motion to quash subpoenas, motion for sanctions, motion to bar evidence, motion for *in camera* review of records, motion to bar discovery, motion for release of evidence and motions to continue. On March 13, 2019, this court held a hearing on a third motion to suppress evidence and statements. On March 27, 2019, parties filed memorandums of law and briefs for the Court to consider. On July 21, 2019, the defendant filed a supplemental brief. The State indicated they would file a response and did so on November 14, 2019. On November 20, 2019, the defendant filed a second supplemental response. The defendant filed his motion to dismiss on January 31, 2020, and shortly thereafter COVID-19 occurred. The Court understands the need to issue timely rulings but the law surrounding the issues in the motion to suppress evidence was fluid and the parties were indicating to the Court they would be supplementing their original briefs, which they did.

On March 23, 2017, the defendant was charged with multiple counts which included charges of Aggravated Criminal Sexual Abuse and Criminal Sexual Assault. The first scheduled trial date for this matter was May 8, 2017. A review of the record indicates that from 5/8/17 until the date of this hearing 6/4/2020, the defendant has continued this matter, on his motion, 27 times. This cause was continued by agreement of the parties four times and has never been continued on motion of the State. The defendant, in his written motion to dismiss[,] contends that the length of time this court had the third motion to suppress evidence under advisement deprived the defendant of his speedy trial rights. However, the defendant completely ignores the fact that he, either on his own motion or by agreement[,] continued the case through and until June 4, 2020."

¶ 35    On September 21, 2020, the defendant's jury trial commenced. Prior to taking testimony in the trial, the trial judge, at the request of the parties, issued her ruling on the State's July 12,

15

2018, motion to bar evidence of phone calls (in which, as described above, the State contended that the defendant purported to have evidence, in the form of text messages, that K.S. made a prank call or calls to the defendant's wife), which the trial judge previously had taken under advisement. With regard to the alleged prank call or calls, she ruled that they would not be allowed because they were "not relevant," did not "prove any element of any of the offense[s] or negate any element of any offense," and did not "have any bearing on this case" because they "happened a year after these alleged incidents occur[ed], and after this case has been charged." With regard to the text messages related in time to the call or calls, she ruled that because there were messages directly between K.S. and the defendant, she would allow them to be admitted at trial.

¶ 36    Because the defendant does not contest the sufficiency of the evidence used at trial to convict him, we need not discuss his trial in detail, although we note that the State did indeed adduce at trial sufficient evidence to sustain all eight convictions of the defendant, and that any argument to the contrary would fail. Not only did K.S. testify in detail about the facts that supported each of the eight charges against the defendant, but Officers Bastilla and Donahey also testified consistently with their earlier testimony at hearings in this case, and each specifically testified about the steps they took during the investigation. Bastilla also testified about portions of his interview with the defendant, which were played for the jury, and which included discussions with the defendant about the defendant's "large volume" of social media communications with K.S. prior to the events that led to the charges against the defendant. On both direct examination and cross-examination, Bastilla authenticated copies of many of the messages, which were admitted into evidence and read to the jury by Bastilla. On direct examination, he testified that via Facebook Messenger, the defendant and K.S. exchanged 575 messages in January of 2017, 460 in February of 2017, and 132 in March of 2017.

16

¶ 37    Detective Nicholaus Roberts testified that he was employed by the Granite City Police Department, and that in August 2018, following his completion of a 40-hour class put on by Cellebrite, he became a Cellebrite certified operator. He testified that he knew that in March 2017, Donahey had done a "file system extraction" on the defendant's phone, and so in August 2018 he did a more advanced Cellebrite extraction, using their latest software, which was called a "physical extraction." He testified that the data contained on the phone was the same in August 2018 as it was in March 2017, but that the physical extraction was "able to get to the memory of the phone on the most basic level, the binary level," to take "a complete image of the memory on the phone, which has the capability of getting deleted information, hidden information, things like that, and puts it on the computer and the computer can change it into a form where we can actually read it." He further testified that by August 2018, "Cellebrite had updated their software to where I was able to get a physical extraction off the phone, which gave us a lot more data than what Detective Donahey was able to do a year and a half prior."

¶ 38    Roberts testified that while reviewing images recovered by the physical extraction, he discovered an application on the phone that was designed to look and function like an ordinary phone calculator, but that, via a password, could be used to hide photos, videos, and other information. He testified that the physical extraction led him to nude images of K.S. that had been hidden in this "calculator vault," which were the same nude images of K.S. that K.S. had previously testified at trial that she sent, at the request of the defendant, to the defendant's phone by Snapchat. He also testified with regard to other communications between the defendant and K.S. using Snapchat.

¶ 39    Aleena Hernandez testified that K.S. was her friend, and that in the winter of 2017, they talked on a regular basis. She testified that K.S. disclosed to her that the defendant had sexually assaulted K.S. "more than once," and that Aleena eventually told Aleena's mother what had

17

happened. She subsequently clarified that by the time she told her mother what had happened, K.S. had already told K.S.'s foster mother about the assaults. Thereafter, the defendant's wife testified about the times she met K.S. when K.S. was with the defendant. The State's final witness was Patricia Radcliffe, who testified that she was a therapist at Alternatives Counseling Services, where she worked with, *inter alia*, victims of sexual abuse. After being tendered, without objection by the defendant, as an expert in the area of child development and children's response to sexual abuse, she testified about the grooming process used by many sex offenders to get close to their victims, and testified as to the reasons a victim of sexual abuse might continue to have contact with the offender, even after being abused, particularly if the victim is vulnerable and comes from an unstable or chaotic home.

¶ 40 Because it is relevant to the issues raised by the defendant in this appeal, we also describe the following events from the defendant's jury trial. During the defendant's cross-examination of K.S., he requested a sidebar, outside of the presence of the jury, at which he requested permission to play for the jury a copy of a video of K.S. he had obtained from a Facebook account, that was posted approximately one week prior to the trial, because he believed the video showed her to be "not quiet at all like she's portrayed herself" when in the courtroom, and he believed the jury should be able to see the difference in her demeanor, as part of their determination of her credibility as a witness. He conceded that he had not previously disclosed the video to the State. The State objected, noting that the video appeared to show K.S. "hanging out with her friends, which is a completely different scenario than sitting in a courtroom talking about sexual assault." Counsel for the State then added, "I would not expect her to act the same way she does in a courtroom as with her friends. I don't think anyone in this courtroom would act the same way in the courtroom versus when you're hanging out with your friends."

18

¶ 41　The trial judge denied the defendant's request to play the video, because "One, it wasn't supplied in discovery. Two, it was filmed a week ago." She added, "We're talking about instances that occurred back in 2017, and you're wanting to play a video of her from a week ago. *** It's not relevant to what happened, whether or not the defendant [sexually assaulted] her or not." She also ruled that "as far as someone's demeanor, I can say everyone in this courtroom acts different because they're in a courtroom. It's a scary place to be. Particularly sitting on the stand talking about a sexual experience." She opined that the defendant's request to play the video was "clearly intended to just smear [K.S.]."

¶ 42　At the conclusion of the trial, the defendant was convicted by the jury of all eight charges against him. On October 6, 2020, the defendant filed a motion for a new trial, which subsequently was denied, but which preserved for review by this court many of the errors alleged by the defendant in this appeal. On March 12, 2021, following the sentencing of the defendant, the trial judge entered an order explaining her factual findings and the legal reasoning behind her decision to deny the defendant's third motion to suppress evidence and the documents that supplemented it, which, as explained above, she had previously denied from the bench on June 4, 2020. In her March 12, 2021, order, she noted that the defendant testified at the hearing on his motion to suppress that "he voluntarily gave the police the passcode to his phone," and that "Officer Donahey testified he did not recall if the [d]efendant gave him the passcode[,] but that he would have been able to 'break-into' the phone using the Cellebrite program without the passcode." She found that "[l]ooking at the totality of the circumstances, the [c]ourt finds the giving of the passcode, if this occurred, was knowing and voluntary," and "that even if it was not voluntary, the police could have ran Cellebrite without the passcode and discovered the contents, inevitable discovery." She further found that the August 2018 search of the defendant's phone was based upon "an objectively reasonable reliance on a search warrant previously secured for the defendant's phone," and that

19

"[w]hen viewing the conduct of the police in this case, there was no reckless disregard of the truth, deceit or intentional bad conduct when they ran the updated version of Cellebrite on the defendant's phone," because they "believed in good faith that because the [d]efendant's phone had been in evidence the entire time, because they had obtained a search warrant to search the phone initially[,] that the search warrant was still valid and an updated version of the same Cellebrite program could be ran without securing another search warrant." The defendant filed a timely notice of appeal. Additional facts will be presented as necessary throughout the remainder of this order.

¶ 43                                    II. ANALYSIS

¶ 44    On appeal, the defendant contends the trial judge erred when she (1) denied the defendant's third motion to suppress evidence, (2) denied his January 31, 2020, motion to dismiss for lack of a speedy trial, (3) granted the State's motion to bar evidence of certain phone calls and texts that the defendant maintains should have been admitted, (4) denied the defendant's motion *in limine* that attempted to bar evidence of his extramarital affairs, (5) allowed at trial evidence of one of his extramarital affairs, while denying video evidence and other evidence about K.S. that the defendant wished to introduce, and (6) allowed evidence on the charges of child pornography that the defendant was being tried upon. We address each of these contentions in turn. We note, at the outset, that a trial judge's decisions may be affirmed on any basis supported by the record on appeal. See, *e.g.*, *People v. Burns*, 2020 IL App (3d) 170103, ¶ 32.

¶ 45    With regard to his contention that the trial judge erred when she denied his third motion to suppress evidence, the defendant argues that the trial judge "should have found that the PIN [to the defendant's cell phone] was obtained in contravention of" his constitutional rights because he had not received *Miranda* warnings "before the detectives questioned him about his PIN and access to his phone." He further contends that he was "compelled" to disclose his PIN. The defendant asserts that "access to his cellular device could not have been gained without the PIN,"

20

and that accordingly, "all evidence seized from his cellular device should have been suppressed." The defendant further contends that "the warrant in this case was facially overbroad and exceeded the probable cause to support it," which is another reason that the trial judge "erred in not suppressing the evidence obtained by the search." With regard to the August 24, 2018, analysis of the contents of his phone, the defendant contends this analysis constituted a "second search" for which no new warrant was ever obtained, and which was not covered or authorized in any way by the first warrant. The defendant notes that the first warrant mentioned looking only for evidence of aggravated criminal sexual assault, not child pornography, and posits that therefore the August 24, 2018, search was related to a "subsequent crime" rather than the offense already under investigation, and therefore was not permissible. In making these arguments, the defendant does not discuss in detail the burden of proof on a motion to suppress evidence, or the proper standard of review, both of which we describe below, and does not acknowledge that the trial judge made findings of fact as to many of the points he raises related to this issue.

¶ 46       The State responds that the defendant's issues related to the initial search of his phone fail because (1) that search "did not exceed the parameters of the warrant," which "was sufficiently particular," (2) the defendant admitted that he volunteered to investigators the PIN number to his phone because he believed a search of his phone would exonerate him, and (3) the police could have obtained the information on his phone even without his PIN. The State further responds that the defendant's issues related to the "second search" of his phone fail because (1) that search "did not exceed the scope of the original warrant," (2) applicable case law holds that "the fourth amendment does not subject data searches to any rigid time limit [because] they may involve much more information than an ordinary document search and require more preparation and a greater degree of care in their execution," and (3) "the images of child pornography found during the second examination were admissible under the plain-view doctrine." The State, in so arguing,

21

provides analysis and case law, including the recent Illinois Supreme Court opinion in *People v. McCavitt*, 2021 IL 125550, that distinguishes the points of authority relied upon by the defendant. The State also points to the testimony from police at trial that no PIN was required to access the phone, and contends that once K.S. reported the defendant's crimes, "there was sufficient evidence to seize [his] phone as evidence." The State asserts that because when police "later did the physical extraction on [his] phone," they did so in a manner that did not require a PIN or password, "all the information on [his] phone would have inevitably been discovered." With regard to the August 24, 2018, examination of the defendant's phone, the State argues that, pursuant to the principles put forward by the Illinois Supreme Court in *McCavitt*, "it is clear that the second look at [the] defendant's cell phone with updated software was not an unreasonable search," and "[t]he warrant for [the] defendant's cell phone was sufficiently particular and was reasonable." The State rejects the defendant's contention that the second examination had anything to do with searching for evidence of a "subsequent crime," instead arguing that "[t]he second look at [the] defendant's phone was looking for exactly the same thing as the first look at his phone—evidence of criminal sexual assault," and that pursuant to *McCavitt*, there is no error if authorities are "reasonably reviewing data for evidence of one crime and happen[ ] to view data implicating [a] defendant in other criminal activity."

¶ 47     In reply, the defendant asserts that he was in fact "compelled" to turn over his PIN to authorities, who he alleges told him that his phone might become inoperable if he did not give them the PIN and they had to "crack" it. He claims that in light of this, he should have been given *Miranda* warnings before the authorities again asked for his PIN code. The defendant reiterates his contention that the warrant was not sufficiently particular, arguing that it was overly broad because it requested, *inter alia*, "all data within, and any data within" the phone, and "any or all" things that were "used in the commission of or may constitute evidence of the offense(s) in

22

connection with which this warrant is issued, being Criminal Sexual Assault." The defendant also provides legal analysis in an attempt to distinguish *McCavitt* from this case, and contends that overall, the warrant "exceeded the probable cause to support it."

¶ 48 The defendant also argues that the "second search" in this case was not permissible, *McCavitt* notwithstanding, because unlike in *McCavitt*, the "second search" in this case "was not a search for evidence contained in the warrant" but was instead a search "for evidence of child pornography." The defendant provides no factual support for this assertion. The defendant further argues that the question of the timeliness of the "second search" is also distinguishable from *McCavitt*, because unlike in that case, in this case he asserts that he "has claimed prejudice by the 17-month delay of the second search and that the police department acted in bad faith." However, nowhere in his briefs does he provide any evidence, or argument, of prejudice as a result of the 17-month delay between the first search and the second one, and nowhere in his briefs does he provide evidence and argument that the Granite City Police Department acted in bad faith in this case. As in his initial brief, at no point in his reply brief does the defendant discuss in detail the burden of proof on a motion to suppress evidence, or the proper standard of review, both of which we describe below, and he again does not acknowledge that the trial judge made findings of fact as to many of the points he raises related to this issue.

¶ 49 We turn now to the law applicable to the defendant's first issue on appeal. When a defendant files a motion to suppress evidence, that defendant bears the burden of proof with regard to that motion. See, *e.g.*, *People v. Woods*, 2019 IL App (5th) 180336, ¶ 27. If the defendant is able to make "a *prima facie* showing that the evidence to which the defendant objects was obtained in an illegal search or seizure, the burden then shifts to the State to provide evidence to counter the *prima facie* case." *Id*. The ultimate burden of proof, however, always remains with the defendant. *Id*. As the Illinois Supreme Court recently reiterated in *People v. McCavitt*, 2021 IL 125550, ¶ 53,

23

the well-established standard of review when a defendant appeals the denial of a motion to suppress evidence is two-fold. We review the trial judge's findings of historical fact for clear error, giving due weight to any inferences drawn from those facts by the trial judge. *Id*. We defer to the factual findings, and will reverse them only if they are against the manifest weight of the evidence. *Id*. A trial judge's factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or if the finding is arbitrary, unreasonable, or not based on the evidence. *People v. Cardona*, 2012 IL App (2d) 100542, ¶ 36. Reviewing courts employ this deferential standard for factual issues because the trial judge "is in a better position to determine the weight and credibility of the witnesses, observe their demeanor, and resolve conflicts in the witnesses' testimony." *People v. Cash*, 396 Ill. App. 3d 931, 938 (2009). If a reviewing court accepts the trial judge's factual findings, the reviewing court will then review *de novo* whether suppression of the evidence is warranted under those facts. *Id*. The reviewing court, however, remains free to engage in its "own plenary review, assessing the facts in relation to the issues presented and drawing [its] own conclusions when deciding what relief is warranted." *Id*. at 938-39.

¶ 50    In this case, a number of facts are in dispute with regard to the first issue raised by the defendant. As explained above, the defendant makes the following assertions of fact on appeal: (1) he had not received *Miranda* warnings "before the detectives questioned him about his PIN and access to his phone," (2) he was "compelled" to disclose his PIN, (3) "access to his cellular device could not have been gained without the PIN," (4) the Granite City Police Department acted in bad faith in this case, and (5) the "second search" was specifically a search for evidence of a "subsequent crime" (child pornography), rather than a search for more evidence of the crimes already charged.

¶ 51    The trial judge did not make any factual findings as to whether the defendant received *Miranda* warnings before he was asked about his PIN and access to his phone, but it is clear from a review of the record that the defendant's factual assertion is not rebutted by the record, as there is no evidence in the record that any officer gave the defendant *Miranda* warnings prior to Detective Bastilla giving him warnings the day after his arrest, just prior to Detective Bastilla's formal interview with him. We discuss the relevance of the defendant's factual assertion in more detail below.

¶ 52    Notwithstanding the lack of a factual finding on the foregoing, the trial judge did find, as a factual matter, that the defendant testified at the hearing on his motion to suppress that "he voluntarily gave the police the passcode to his phone," and that "Officer Donahey testified he did not recall if the [d]efendant gave him the passcode[,] but that he would have been able to 'break-into' the phone using the Cellebrite program without the passcode." She found that "[l]ooking at the totality of the circumstances, the [c]ourt finds the giving of the passcode, if this occurred, was knowing and voluntary," and "that even if it was not voluntary, the police could have ran Cellebrite without the passcode and discovered the contents, inevitable discovery." She further found that the August 2018 search of the defendant's phone was based upon "an objectively reasonable reliance on a search warrant previously secured for the defendant's phone," and that "[w]hen viewing the conduct of the police in this case, there was no reckless disregard of the truth, deceit or intentional bad conduct when they ran the updated version of Cellebrite on the defendant's phone," because they "believed in good faith that because the [d]efendant's phone had been in evidence the entire time, because they had obtained a search warrant to search the phone initially[,] that the search warrant was still valid and an updated version of the same Cellebrite program could be ran without securing another search warrant."

¶ 53     With regard to her factual finding that the defendant testified at the hearing on his motion to suppress that "he voluntarily gave the police the passcode to his phone," it is indisputably true that on cross-examination, the defendant did agree that he voluntarily gave his PIN to Donahey, and that he also testified on cross-examination that Donahey did not threaten him or harm him in any way. Although it is also true that the defendant testified on direct examination that after Donahey asked for the PIN, the defendant "hesitated," and told Donahey that he did not feel comfortable, but that he would give it to Donahey if Donahey needed it and if it would help the defendant get out of the holding cell, this testimony does not directly contradict his testimony that he voluntarily gave the PIN to Donahey. The defendant never testified that he was "compelled" or otherwise forced to give the PIN, and accordingly there is no testimony to support the defendant's assertion on appeal that he was "compelled" to provide the PIN. Moreover, as explained above, it was the province of the trial judge to resolve any conflicts, or potential conflicts, in the testimony, and it is clear that she believed the defendant's testimony on cross-examination that he voluntarily gave Donahey the PIN was more credible than any possibly contradictory testimony on direct examination. The opposite conclusion to her factual finding is not clearly evident, nor is her finding arbitrary, unreasonable, or not based upon the evidence. Accordingly, as explained above, it is not against the manifest weight of the evidence, and we will defer to it.

¶ 54     Moreover, the trial judge's factual finding is, as the State suggests on appeal, also supported by the defendant's statement in his August 29, 2018, motion "that at the time of his arrest [he] voluntarily gave all pin codes and passwords to the police for his cellular devices and Nest accounts. His intent was to allow the police to thoroughly examine all cellular data with the belief that after doing so his name would be cleared." This statement reveals, unequivocally, that the defendant's decision to give his PIN to police at the time of his arrest was a voluntary, strategic, and intentional decision. It demonstrates that at the time of his arrest, either (1) he truly believed

26

there was no incriminating evidence on the phone, perhaps because he believed he had successfully deleted it all, or (2) he believed that to the extent that there still was incriminating evidence on his phone of his relationship with K.S.—including, *inter alia*, the nude photos of K.S. that were in fact still on the phone at that time—he had adequately hidden the incriminating photos in the "calculator vault" application that was designed expressly for the purpose of hiding images and other materials, and that therefore the police would not find the evidence and the defendant's "name would be cleared." Either way, his choice was clearly voluntary, strategic, and intentional. The fact that the police ultimately were able to find the evidence the defendant had hidden in the "calculator vault" does not somehow retroactively invalidate the consent he granted to authorities "to thoroughly examine all cellular data with the belief that after doing so his name would be cleared." We note as well that on August 29, 2018, the trial judge, by docket entry, noted that a hearing had been held on the motion in which the defendant made the foregoing statement, but the defendant has failed to provide a transcript of that hearing, or a bystander's report, in the record on appeal. Thus, although the docket entry notes that no testimony was taken at the hearing, and that the defendant was not present, we have no way of knowing what argument was presented by the State or by the defendant's attorney at the hearing.

¶ 55 Because, for the above reasons, we reject the defendant's factual assertion that he was "compelled" to reveal his PIN code in this case, and instead conclude that he voluntarily revealed it, we find inapposite the case advanced by the defendant in support of his argument—*People v. Spicer*, 2019 IL App (3d) 170814, ¶¶ 13-25—which, unlike this case, involved a situation in which the State asked the trial court to compel the defendant to unlock his lawfully-seized telephone, the trial court denied the request to compel, and our colleagues in the Third District of this court upheld the trial court's denial, reasoning that compelling a defendant to supply the defendant's passcode to unlock a cell phone implicates the defendant's fifth amendment right against self-incrimination.

27

In addition to *Spicer* being factually distinguishable from this case, and therefore inapplicable, for the above reasons, we note as well that a recent decision from our colleagues in the Fourth District of this court—*People v. Sneed*, 2021 IL App (4th) 210180, ¶¶ 59-63—has called into question the validity of the reasoning of the *Spicer* court, and has held instead that requiring a defendant to unlock a cell phone, or provide a passcode PIN to unlock that phone, does not compel that defendant "to provide testimony within the meaning of the fifth amendment." However, due to our factual finding, we need not weigh in on the relative merits of *Spicer* and *Sneed*, and therefore decline to do so.

¶ 56 With regard to the defendant's factual assertion on appeal that "access to his cellular device could not have been gained without the PIN," the trial judge's finding that "Officer Donahey testified he did not recall if the [d]efendant gave him the passcode[,] but that he would have been able to 'break-into' the phone using the Cellebrite program without the passcode" was indisputably correct as well, as Donahey did so testify. In fact, Donahey testified unequivocally, multiple times, that he could have accessed the phone without the defendant's PIN. This testimony was never directly rebutted, although the defendant testified that to his knowledge, the phone could not be accessed without the PIN. Again, it was the province of the trial judge to resolve any conflicts in the testimony, and it is clear that she believed Donahey, not the defendant, and relied upon a factual finding that Donahey's testimony was truthful and correct to support her conclusion that the police could have used Cellebrite to access the defendant's phone even without a PIN. The opposite conclusion to her factual finding is not clearly evident, nor is her finding arbitrary, unreasonable, or not based upon the evidence. Accordingly, as explained above, it is not against the manifest weight of the evidence, and we will defer to it.

¶ 57 With regard to the defendant's factual assertion that the Granite City police acted in bad faith with regard to the "second search" in this case, the trial judge found that the August 2018

28

search of the defendant's phone was based upon "an objectively reasonable reliance on a search warrant previously secured for the defendant's phone," and that "[w]hen viewing the conduct of the police in this case, there was no reckless disregard of the truth, deceit or intentional bad conduct when they ran the updated version of Cellebrite on the defendant's phone," because they "believed in good faith that because the [d]efendant's phone had been in evidence the entire time, because they had obtained a search warrant to search the phone initially[,] that the search warrant was still valid and an updated version of the same Cellebrite program could be ran without securing another search warrant." With regard to these findings that the police did not act in bad faith, the opposite conclusion is not clearly evident, nor are the findings arbitrary, unreasonable, or not based upon the evidence. Accordingly, as explained above, they are not against the manifest weight of the evidence, and we will defer to them.

¶ 58 Moreover, nowhere in his briefs on appeal has the defendant provided even a scintilla of evidence, or argument related to that evidence, regarding how he was prejudiced by the 17-month delay in this case, and he has provided no evidence or argument on appeal in support of his unsubstantiated assertion that the police acted in bad faith in this case, both of which therefore amount to nothing more than speculation by the defendant on appeal. Such speculation is not sufficient to provide a factual basis for his claim, which would therefore fail even if this court were to employ a *de novo* review of the claim, because, as explained above, when a defendant files a motion to suppress evidence, that defendant bears the burden of proof with regard to that motion. See, *e.g.*, *Woods*, 2019 IL App (5th) 180336, ¶ 27. If the defendant is able to make "a *prima facie* showing that the evidence to which the defendant objects was obtained in an illegal search or seizure, the burden then shifts to the State to provide evidence to counter the *prima facie* case." *Id*. The ultimate burden of proof, however, always remains with the defendant. *Id*. In this case, with regard to this claim, the defendant has failed with regard both to his initial burden, and his ultimate

burden. In addition, it is well-established that a claim on appeal that is not supported by evidence and argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Moreover, contrary to the unsupported insinuations of the defendant, when the efforts of the police, and the State, in this case are reviewed in their entirety in the record on appeal, there is nothing to suggest that either ever had any motive other than the proper investigation and prosecution of serious crimes of a sexual nature that involved the exploitation and victimization of a vulnerable 13-year-old child.

¶ 59    With regard to the defendant's factual assertion that the "second search" was conducted specifically to seek out evidence of crimes different from those already charged—a theory the defendant alluded to in his January 29, 2019, motion to suppress evidence when he noted that a second search warrant was never obtained, and that the first warrant allowed "a search for only evidence related to criminal sexual abuse, not child pornography"—the defendant certainly had the opportunity, at the March 13, 2019, hearing on that motion, to subpoena and question police witnesses in an effort to develop such a theory. He did not do so. In fact, not a single question was asked of law enforcement witnesses by the defendant during that hearing about his theory that the "second search" was conducted to seek out evidence of crimes other than those already charged. Thus, there is no factual evidence in the record to support the defendant's theory, and we decline to indulge a theory that is based purely upon speculation, particularly where the opportunity to develop the theory in the trial court existed and was not utilized. Again, as explained above, when a defendant files a motion to suppress evidence, that defendant bears the burden of proof with regard to that motion. See, *e.g.*, *Woods*, 2019 IL App (5th) 180336, ¶ 27. If the defendant is able to make "a *prima facie* showing that the evidence to which the defendant objects was obtained in

an illegal search or seizure, the burden then shifts to the State to provide evidence to counter the *prima facie* case." *Id*. The ultimate burden of proof, however, always remains with the defendant. *Id*. In this case, with regard to this claim too, the defendant has failed with regard to both his initial burden and his ultimate burden.

¶ 60     When the defendant's unsupported theory is discarded, the only reasonable conclusion is that the purpose of the "second search" was to look for, as the State aptly puts it, "exactly the same thing as the first look at his phone—evidence of criminal sexual assault." As the State also correctly notes, pursuant to *McCavitt* and the well-established precedent cited therein, under the plain view doctrine there is no error if authorities are reasonably reviewing data for evidence of one crime and happen to view data implicating a defendant in other criminal activity. *McCavitt*, 2021 IL 125550, ¶¶ 109-15. We conclude that is what happened in this case.

¶ 61     Because we have accepted the factual findings of the trial judge that are described above, we review *de novo* whether suppression of the evidence is warranted under these facts. See, *e.g.*, *People v. Cash*, 396 Ill. App. 3d 931, 938 (2009). We begin with the defendant's strictly legal claim that the search warrant in question was "overly broad" because it requested, *inter alia*, "all data within, and any data within" the phone, and "any or all" things that were "used in the commission of or may constitute evidence of the offense(s) in connection with which this warrant is issued, being Criminal Sexual Assault." We agree with the State that *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018), is dispositive of this claim. Therein, the federal Seventh Circuit Court of Appeals ruled that a search warrant that authorized officials to search the defendant's cell phone and to seize " 'any evidence (including all photos, videos, and/or any other digital files, including removable memory cards) of suspect identity, motive, scheme/plan along with DNA evidence of the crime of Criminal Recklessness with a deadly weapon which is hidden or secreted [in the cellphone or] related to the offense of Dealing illegal drugs' " was permissible. *Id*. The

court ruled that the warrant was not "too general" for fourth amendment specificity purposes simply because it allowed "the police to look at every file on [the defendant's] phone and decide which files satisfy the description." *Id*. The court reasoned that "specificity is a relative matter," and that a warrant will be found to be "too general" only in cases where "some more-specific alternative would have done better at protecting privacy while still permitting legitimate investigation." *Id*. at 337. The court added that "a warrant need not be more specific than knowledge allows," and that as long as a warrant is as specific as the known facts and circumstances allow, "[t]he Constitution does not require more." *Id*. at 338. In this case, the defendant has presented no argument on appeal that there were facts or circumstances known to the police at the time they sought their warrant that required them to be more specific in their description in the warrant. Accordingly, the defendant has forfeited consideration of any such argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing).

¶ 62    Although the defendant asks this court to rely on *United States v. Winn*, 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015), rather than *Bishop*, the defendant does not explain how a federal trial court memorandum and order such as the federal district court order in *Winn* can take precedence over a later-issued decision of a federal appellate court, such as the *Bishop* decision of the Seventh Circuit Court of Appeals. Instead, he erroneously claims in his reply brief that *Bishop* and *Winn* are *both* federal district court orders. Moreover, the State is correct that decisions such as *Winn* that are issued by "federal district courts are not binding upon state courts and are, at most, persuasive authority." *Rockford Police Benevolent & Protective Ass'n v. Morrissey*, 398 Ill. App. 3d 145, 153 (2010). In any event, we agree with the reasoning of the *Bishop* court, and conclude

32

that because the language in the warrant in this case is certainly no more broad than that in *Bishop* (which, we reiterate, allowed authorities "to look at every file on [the defendant's] phone" to search for evidence related to the crimes listed in the warrant (see 910 F.3d at 336)), there is no merit to the defendant's claim that the warrant in this case was overly broad, or somehow morphed into an impermissible "general warrant." With regard to the defendant's related claim that the warrant "exceeded the probable cause to support it," in support of this claim the defendant relies upon the *Winn* reasoning, which we have already rejected. Moreover, as a factual matter, there was ample probable cause, following K.S.'s report of the crimes committed by the defendant against her, to support the issuance of the warrant in this case.

¶ 63    With regard to the defendant's legal claim that the August 24, 2018, analysis of the contents of his phone was a "second search" for which no new warrant was ever obtained, and which was not covered or authorized in any way by the first warrant (because the first warrant mentioned looking only for evidence of aggravated criminal sexual assault, not child pornography), the State claims that *McCavitt* is dispositive. The defendant disagrees. Applying the factual findings of the trial judge in this case, as well as our other findings above, to the legal principles set forth by the Illinois Supreme Court in *McCavitt*, we agree with the State. We first note that *McCavitt* involved a computer, rather than a cell phone. 2021 IL 125550, ¶¶ 1-2. However, we agree with the State— and the defendant does not disagree in his briefs on appeal—that a cell phone is essentially a "minicomputer," and that accordingly the same analysis applies to both types of electronic devices. See, *e.g.*, *Riley v. California*, 573 U.S. 373, 393 (2014) (many cell phones "are in fact minicomputers that also happen to have the capacity to be used as a telephone," and that have "immense storage capacity"). The *McCavitt* court began with the premise—for which it cited a recent *en banc* decision from the Michigan Supreme Court—"that a search of an electronic storage device pursuant to a warrant must be reasonably directed at obtaining evidence relevant to the

33

criminal activity alleged in the warrant," and that accordingly, "[a] search of digital data that is directed instead at uncovering evidence of criminal activity not identified in the warrant is effectively a warrantless search that violates the fourth amendment absent some exception to the warrant requirement." 2021 IL 125550, ¶ 5.

¶ 64    The *McCavitt* court noted that the first search warrant complaint in the matter on appeal before the *McCavitt* court "alleged that digital evidence of criminal sexual assault could be found on [the] defendant's cellular phone," and that therefore "the warrant authorized the seizure of 'any electronic media cable [*sic*] of video/audio recording' and 'any electronic storage media capable of stor[ing] pictures, audio or video.' " *Id.* ¶ 14. The court further noted that the first warrant also authorized, *inter alia*, the seizure of "any additional items of evidentiary value." *Id.* The court then noted that a second search warrant was obtained, which authorized authorities "to search the [defendant's] computer for 'any and all digital images, including, but not limited to JPG, GIF, TIF, AVI, MOV, and MPEG files' and 'any evidence of' the offenses of (1) aggravated criminal sexual assault, (2) unlawful restraint, and (3) unauthorized video recording and live video transmission.' " *Id.* ¶ 19. The court further noted that "[t]he warrant authorized a search of 'any and all stored/deleted data to determine which particular files are evidence or instrumentalities of criminal activity.' " *Id.* The police officer who examined the defendant's computer "made an exact, unalterable digital copy of its contents" (*id.* ¶ 21), which was examined by police on two separate occasions. *Id.* ¶¶ 22, 25-26. During the second search, images that appeared to be child pornography were discovered, and the officer who discovered them then suspended his search and applied for another warrant to further examine the computer's contents for more evidence of child pornography. *Id.* ¶ 26. Once that warrant was obtained, police searched the computer again and found more evidence of child pornography. *Id.* ¶¶ 34-35.

34

¶ 65 Thereafter, the defendant was tried and convicted of several counts of child pornography. *Id*. ¶ 43. On appeal from those convictions, the *McCavitt* court considered, *inter alia*, the "scope" of the warrant at issue (*id*. ¶¶ 89-104) and the timeliness of the second examination of the data found on the defendant's computer. *Id*. ¶¶ 105-08. With regard to scope, the court began with the longstanding principle that a search warrant need not contain a minute and detailed description of the property to be seized, but that the property must be so definitely described that the officer making the search will not seize the wrong property. *Id*. ¶ 89. Ultimately, the court did not find that the warrant authorizing authorities to search for " 'any and all digital images, including, but not limited to JPG, GIF, TIF, AVI, MOV, and MPEG files' " (*id*. ¶ 102) was problematic (which we note, is consistent with the finding in *Bishop*, discussed above), and did not find that the search exceeded the scope of the warrant, because under the circumstances it was clear that the police officer in question "did not engage in a fishing expedition" such as occurs if an officer "purposefully searches for evidence of a crime other than the one identified in the warrant." *Id*. ¶¶ 103-04.

¶ 66 With regard to the timeliness of the second examination of the data found on the defendant's computer, the court did not find the eight-month delay between the searches to be unreasonable, noting that "the fourth amendment does not place explicit limits on the duration of any forensic analysis authorized by a warrant." *Id*. ¶ 106. The court further noted that "[a] search of digital data that takes several years may be reasonable as long as the search ends before trial and does not exceed the scope of the original search warrant." *Id*. ¶ 107 (citing *United States v. Johnston*, 789 F.3d 934, 942-43 (9th Cir. 2015)). The court also found the delay to be reasonable because there was no evidence that (1) probable cause for the warrant had lapsed, (2) the defendant had been prejudiced by the delay, or (3) the police acted in bad faith. *Id*. ¶ 108. With regard to

probable cause lapsing, the court noted that such was not possible in the case before it, because the data in question "remained secured and unaltered" while in police custody. *Id.*

¶ 67    As noted above, in his reply brief, the defendant attempts to distinguish *McCavitt* by claiming that, unlike in *McCavitt*, the "second search" in this case "was not a search for evidence contained in the warrant" but was instead a search "for evidence of child pornography." We have already determined that there is no support in the record for this factual assertion. He further claims that the question of the timeliness of the "second search" is also distinguishable from *McCavitt*, because unlike in that case, in this case he asserts that he "has claimed prejudice by the 17-month delay of the second search and that the police department acted in bad faith." We have already determined that there is no support in the record, or his briefs on appeal, for either of these assertions of fact as well.

¶ 68    To the contrary, based upon the factual findings of the trial judge which we, as described above, accept as true because they are not against the manifest weight of the evidence, and our other findings above, the defendant's attempts to distinguish *McCavitt* fail. As in *McCavitt*, in this case, when we review *de novo* whether suppression of the evidence is warranted in light of the trial judge's historical findings of fact, as well as our other findings above, we are led to conclude that (1) the "second search" of the data on the defendant's cell phone was for evidence of the crimes alleged in the search warrant, not "subsequent" or different crimes of child pornography, and thus the search was authorized pursuant to the warrant and no additional warrant was required; (2) the police did not act in bad faith; (3) the defendant did not demonstrate that he was prejudiced by the 17-month delay; and (4) probable cause could not have lapsed, because the defendant's cell phone was "secured and unaltered" in the Granite City Police Department evidence vault at all relevant times. Accordingly, the defendant's argument on appeal does not provide a basis for us to conclude that the trial judge erred when she denied the defendant's third motion to suppress

evidence, because he has not shown that either the search warrant in this case, or the actions of police pursuant to the warrant, were in any way flawed.

¶ 69    We return now to the relevance of the defendant's factual assertion that he had not received *Miranda* warnings "before the detectives questioned him about his PIN and access to his phone." As discussed above, the trial judge did not make a finding of fact with regard to this point, and as also discussed above, the record does not rebut the defendant's factual assertion, as there is no evidence in the record that any officer gave the defendant *Miranda* warnings prior to Detective Bastilla giving him warnings the day after his arrest, just prior to Detective Bastilla's formal interview with him. However, because we have concluded, directly above, that the search warrant issued and executed in this case was legally sufficient, and because we have concluded that the trial judge's factual finding that no PIN was required for the police to access the defendant's cell phone was correct, it is of no consequence if the defendant did not receive *Miranda* warnings before he was asked about his PIN and access to his phone. Pursuant to the doctrine of inevitable discovery, evidence that might otherwise be excluded from trial may be admitted if the State can demonstrate that the evidence would inevitably have been discovered, notwithstanding any alleged police error or misconduct. See, *e.g.*, *Burns*, 2020 IL App (3d) 170103, ¶ 48. In this case, armed with the aforementioned legally-sufficient search warrant, and with or without the defendant's PIN, the police could have, and would have, accessed the defendant's phone and discovered all of the evidence that he seeks to suppress. Thus, for all of the aforementioned reasons, the trial judge did not err when she denied the defendant's third motion to suppress evidence.

¶ 70    With regard to the second issue raised in this appeal—that the trial judge erred when she denied the defendant's January 31, 2020, motion to dismiss for lack of a speedy trial—the defendant contends that although it is true that in general, delays occasioned by a defendant's filing of a motion to suppress evidence are to be attributed to the defendant for purposes of tolling the

speedy trial requirements, in this case, the trial judge took such a long time to issue her ruling on his third motion to suppress evidence that this court "should reverse and dismiss the case against" him. The defendant attempts to invoke, *inter alia*, federal law, related to federal regulations, and state law from other jurisdictions, as well as from Illinois, to buttress his claim that when a motion to suppress evidence is taken under advisement for a lengthy period of time, at least some of the resulting delay should not be attributed to the defendant for speedy trial purposes. The defendant also contends that under the Illinois statutory speedy trial provisions for persons—such as himself—who were out on bond the entire time prior to trial, this court should find a speedy trial violation because he does not believe it is clear from the record that he agreed to many of the delays that were attributed to him. In making these arguments, the defendant does not discuss in detail the proper standard of review, which we describe below, and does not acknowledge that the trial judge made findings of fact as to whom the delays were attributable in this case.

¶ 71    The State responds that the defendant has failed to meet his burden to show that the trial judge erred because, *inter alia*, (1) "the record readily establishes that defense counsel agreed to every delay of the trial, from May 8, 2017, through the denial of his *pro se* motion to dismiss, all the way until the day his trial started," and (2) "this case was delayed by the emergency of the worldwide COVID-19 pandemic, which caused delays in jury trials, which further tolled the speedy trial clock." The State asserts that case law is clear that "to show a violation of his speedy trial right, a defendant must show that he did not cause or contribute to the delays," and that in this case, the record on appeal simply does not support the defendant's position. The State contends that when the record on appeal is examined in conjunction with relevant case law regarding to which party a delay must be attributed, it is clear that the "defendant is responsible for all but 47 days of the delay in this case," which means that there was no speedy trial violation in this case. In particular, the State notes case law that "[a] defendant is considered to have occasioned a delay

38

when he requests a continuance, agrees to a continuance, or when his actions otherwise cause or contribute to the delay," and that such actions by the defendant are the reasons for the delays he attempts to avoid in this case. The State adds that under the same case law, "[d]elay cannot be attributed to a defendant only when the record is silent or the defendant fails to object to a delay requested by the State," and that here, "the record is not silent as to defendant's agreement to (or request for) any of the continuances," and "the State did not file any requests for continuance which would have delayed [the] defendant's trial." The State rejects the defendant's argument that the trial judge's delay in issuing a ruling on the defendant's third motion to suppress evidence was unreasonable, and notes that in any event, if the defendant wished to invoke his speedy trial rights, "objected to further continuances[,] *** insisted on a decision on the motion to suppress which was under advisement[,] or if he was ready to go to trial without a ruling on that motion, [he] should have made a record," which he did not.

¶ 72    In reply, the defendant reiterates his contention that the trial judge's delay in issuing a ruling on his motion to suppress was unreasonable, and that accordingly, at least some of that delay should not be attributed to him and should instead be considered as proof that his speedy trial rights were violated. He thereafter contends that the "entire time the motion was under advisement should not be attributed to" him, because the length of time was, again, "unreasonable." He also disputes the State's position that he asked for or agreed to almost all of the continuances, and contends that any announcement by a defendant that the defendant is ready for trial must be construed strictly as an objection to any continuances, notwithstanding the absence of a record showing that he actually made any such objections in the trial court. He cites no case law in support of this proposition. He contends that the State misinterprets his argument, and that in fact his argument is "that his constitutional right to a speedy trial was violated by the unreasonable delay in resolving [his] [m]otion to [s]uppress." The defendant does not directly address the State's contention that during

39

the time the motion to suppress was under advisement—which, as explained above, is the period of time that the defendant claims in his briefs was unreasonable—the defendant made no efforts to expedite the trial judge's ruling on his motion, did not inform the trial judge that he wished to go to trial without a ruling on the motion, and did not make any type of speedy trial demand, on the record, during that time, aside from his announcement that he was ready for trial, and his counsel's subsequent adoption of his *pro se* motion to dismiss. As in his initial brief, at no point in his reply brief does the defendant discuss in detail the proper standard of review, or acknowledge the findings of fact made by the trial judge with regard to this issue in this case.

¶ 73　We turn now to the law applicable to this claim. Criminal defendants in Illinois have both constitutional (federal and state), and statutory, rights to a speedy trial. *People v. Sykes*, 2017 IL App (1st) 150023, ¶ 35. In this case, the defendant asserts both. With regard to our standard of review, a trial judge's findings of fact on a defendant's speedy trial claim are reviewed under the manifest weight of the evidence standard. *Id*. As noted above, a trial judge's factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, or if the finding is arbitrary, unreasonable, or not based on the evidence. *Cardona*, 2012 IL App (2d) 100542, ¶ 36. As with a motion to suppress evidence, we review *de novo* the ultimate question of whether a defendant's statutory right to a speedy trial has been violated. *Sykes*, 2017 IL App (1st) 150023, ¶ 35.

¶ 74　The State has a responsibility to bring a defendant to trial within the appropriate statutory period, but if a defendant files a motion to dismiss on speedy trial grounds, that defendant is obligated to "affirmatively show" that the defendant's rights were violated. *Id.* ¶ 36. If a defendant's acts caused or contributed to a delay, that delay is attributed to the defendant. *People v. Jones*, 273 Ill. App. 3d 377, 380 (1995). "A court of review must only consider the record made in the trial court in determining the existence of a speedy trial violation." *Id*. at 380-81. If the

parties have expressly agreed to a continuance, that is an affirmative act by the defendant contributing to the delay of the proceedings. *Id.* at 381. However, a "[d]elay based upon a silent record cannot be attributed to the defendant." *Id.* If it is difficult for a reviewing court to determine from the record to whom a delay is attributable, then the trial judge's "judgment is given substantial deference." *Id.* Unless we discern "a clear abuse of discretion, this court must sustain the trial [judge's] determination as to whom delay is attributed." *Id.* A trial judge abuses the judge's discretion when the judge acts arbitrarily or where no reasonable person would take the judge's view. *People v. Stoffel*, 389 Ill. App. 3d 238, 244 (2009). We note as well that the State is correct that, as a general proposition of law, only in exceptional circumstances will a delay in ruling on a defense motion not be attributed to the defendant. See, *e.g.*, *People v. Harper*, 279 Ill. App. 3d 801, 808 (1996).

¶ 75    With regard to this issue, as with regard to the defendant's first issue, several key facts are in dispute on appeal. As explained above, the trial judge made the following factual findings:

> "Over the course of this case, through June 4, 2020, the Court has held over a dozen hearings, dealing with numerous motions, including: three separate motions to suppress evidence and/or statements with hundreds of pages of attachments and supplemental addendums, two motions to dismiss, motions to compel, motion for bill of particulars, multiple motions *in limine*, motion to quash subpoenas, motion for sanctions, motion to bar evidence, motion for *in camera* review of records, motion to bar discovery, motion for release of evidence and motions to continue. On March 13, 2019, this court held a hearing on a third motion to suppress evidence and statements. On March 27, 2019, parties filed memorandums of law and briefs for the Court to consider. On July 21, 2019, the defendant filed a supplemental brief. The State indicated they would file a response and did so on November 14, 2019. On November 20, 2019, the defendant filed a second supplemental

response. The defendant filed his motion to dismiss on January 31, 2020, and shortly thereafter COVID-19 occurred. The Court understands the need to issue timely rulings but the law surrounding the issues in the motion to suppress evidence was fluid and the parties were indicating to the Court they would be supplementing their original briefs, which they did.

On March 23, 2017, the defendant was charged with multiple counts which included charges of Aggravated Criminal Sexual Abuse and Criminal Sexual Assault. The first scheduled trial date for this matter was May 8, 2017. A review of the record indicates that from 5/8/17 until the date of this hearing 6/4/2020, the defendant has continued this matter, on his motion, 27 times. This cause was continued by agreement of the parties four times and has never been continued on motion of the State. The defendant, in his written motion to dismiss[,] contends that the length of time this court had the third motion to suppress evidence under advisement deprived the defendant of his speedy trial rights. However, the defendant completely ignores the fact that he, either on his own motion or by agreement[,] continued the case through and until June 4, 2020."

¶ 76    Also as explained above, the defendant does not even acknowledge, in his briefs on appeal, these findings of fact by the trial judge, let alone attempt to explain to this court how the opposite conclusion to that of the findings is clearly evident, or how the findings are arbitrary, unreasonable, or not based on the evidence, and therefore how the findings are against the manifest weight of the evidence. See, *e.g.*, *Cardona*, 2012 IL App (2d) 100542, ¶ 36. That failure on the part of the defendant notwithstanding, we have thoroughly reviewed the defendant's factual assertions about the state of the record, and we do not believe that they are sufficient to show that the trial judge's factual findings were against the manifest weight of the evidence, or that the delay in this case was so unreasonable as to have violated the speedy trial rights of the defendant.

42

¶ 77    To the contrary, the trial judge's factual findings are substantiated by the record on appeal, which is discussed in detail above. In his opening brief on appeal, the defendant points to nothing in the record that positively rebuts the trial judge's findings. Instead, he points only to the following purported inconsistencies, claiming that: (1) he did not agree to all of the delays in this case, but at times "merely acquiesced" to trial dates set by the trial court, which means such delays should not be attributed to him, despite the fact that he made no contemporaneous record of "merely acquiescing" rather than agreeing to the delays; (2) "[a]lthough [he] agreed to the trial order continuances, the fact of the matter was that the trial court had the motion to suppress under advisement for close to a year and judicial procrastination should not be attributed to the defendant"; and (3) some of the orders attributing delay to the defendant were "not [in] defense counsel's handwriting," and he "did not consent to a continuance after announcing ready for trial." In his reply brief on appeal, the defendant reiterates his position that, as a factual matter, he "did not ask for or agree to almost every continuance," and then claims, without citation to authority, that "his announcement that he was ready for trial starts the time for speedy trial considerations." He again argues the three purported inconsistencies described above, and claims that the issues involved with his motions were not complex and should not have taken so long for the trial judge to resolve.

¶ 78    In light of the defendant's failure to raise any of these issues contemporaneously with the issuance of the orders in question, we find the defendant's later attempts to recharacterize them as ambiguous, inconsistent, or otherwise favorable to him—both in the trial court and in this court— to be highly dubious, as well as self-serving and lacking in credibility. If orders were being entered by the trial judge, with regard to continuances or anything else, that the defendant believed were not accurate in terms of to whom delays were attributable, or that the defendant believed were internally inconsistent because the orders stated both that (1) the continuance in question was on

the motion of the defendant with the delay attributable to the defendant, and (2) that the defendant was ready for trial, the defendant had a responsibility to call that to the attention of the trial judge at that time. See, *e.g.*, *Mitchell v. Fiat-Allis, Inc.*, 158 Ill. 2d 143, 151 (1994) (attorney has a duty "to monitor [attorney's] case closely enough to become aware that the [trial judge has] ruled"). He failed to do so, and only later attempted to recast those orders in a different light. On a related note, the State is correct that if the defendant "objected to further continuances[,] *** insisted on a decision on the motion to suppress which was under advisement[,] or if he was ready to go to trial without a ruling on that motion, [he] should have made a record," which he did not.

¶ 79    Indeed, the defendant's belated attempts to recharacterize the record ring particularly hollow in light of the trial judge's comments, following the March 13, 2019, hearing on the defendant's third motion to suppress evidence, that she was frustrated with the pace at which the case was proceeding to trial, after which she added, "let's be clear, once this motion is ruled on and I rule on the other motion [presently under advisement], this case is going to trial." She then added, "And I am going to push it to the first available date. So I don't care if you have vacations planned. I don't care if you have other trials going. This case is two years old." She further added that, in light of the severity of the charges, "I want it to be clear that we did everything that we were supposed to do in moving this case along and presenting the evidence in a manner that the law requires." Clearly, the trial judge was cognizant of the rights of everyone involved, and was exercising diligence in attempting to get the case to trial. There is no evidence in the record on appeal that her position with regard thereto ever changed.

¶ 80    Moreover, the defendant's contentions also ignore the factual finding by the trial judge that "the parties were indicating to the Court they would be supplementing their original briefs, which they did." Indeed, this factual finding is substantiated by the supplemental filings of the defendant himself. It is, after all, undeniable that (1) on July 2, 2019, a little over three months after the trial

judge received the arguments and case law of the parties following the hearing on the defendant's third motion to suppress evidence, the defendant filed a "first supplemental brief in support of [his] motion to suppress," in which he discussed a recently-filed case from our colleagues in the First District of this court, and (2) the defendant's January 31, 2020, *pro se* motion to dismiss on speedy trial grounds was filed only a little more than two months after the defendant, on November 20, 2019, filed his "first amended motion to suppress evidence"—as well as his "second supplemental brief in support of [his] motion to suppress evidence"—in both of which he argued for the first time a new theory under which he believed the evidence in question should be suppressed: that "all searches of the defendant's cellular phone were overbroad and not particular enough to satisfy the fourth amendment."

¶ 81    Although the trial judge certainly could have—pursuant to her "discretion to manage [her] docket" (see *Bank of America, N.A. v. Land*, 2013 IL App (5th) 120283, ¶ 24)—set a cut-off date for additional filings, and told the parties that she would not allow them to supplement their filings beyond that date, even as new developments in this "fluid" area of the law emerged, we do not believe it was unreasonable for her to decline to set such a date, particularly where the defendant never asked her to do so. We note as well that had she done so *sua sponte*, the defendant's aforementioned July 2, 2019, supplemental brief, as well as his November 20, 2019, first amended motion to suppress, and his brief in support thereof—which the defendant filed *after* two of his "announcements" that he was ready for trial, and upon which he relies in part in this appeal—might not have been allowed in this case. The trial judge also did not err when she found that "the law surrounding the issues in the motion to suppress evidence was fluid." Indeed, as discussed above, *McCavitt* was not decided until after this appeal commenced.

¶ 82    For all of the foregoing reasons, we conclude that, with regard to the trial judge's factual findings as to the delays in this case, the opposite conclusion is not clearly evident, and her factual

findings are not arbitrary, unreasonable, or not based upon the evidence; accordingly, her factual findings on this issue are not against the manifest weight of the evidence. See *Cardona*, 2012 IL App (2d) 100542, ¶ 36. Although we need not rely upon it in this case, we reiterate that if it is difficult for a reviewing court to determine from the record to whom a delay is attributable, then the trial judge's "judgment is given substantial deference." *Jones*, 273 Ill. App. 3d at 381. Unless we discern "a clear abuse of discretion, this court must sustain the trial [judge's] determination as to whom delay is attributed." *Id*. A trial judge abuses the judge's discretion when the judge acts arbitrarily or where no reasonable person would take the judge's view. *Stoffel*, 389 Ill. App. 3d at 244. In this case, for all of the foregoing reasons, we discern no abuse of discretion at all on the part of the trial judge. Accordingly, because for all of the above reasons we accept the factual findings of the trial judge, we conclude that the defendant has not established a sufficient factual basis in support of his constitutional and statutory speedy trial claims, and those claims fail. Indeed, in light of the record before us—which is far from silent with regard to the attribution of delays (see *Jones*, 273 Ill. App. 3d at 381)—we conclude that there exist in this case no exceptional circumstances that would result in a delay in ruling on a defense motion not being attributed to the defendant. See *Harper*, 279 Ill. App. 3d at 808.

¶ 83　Because the defendant's claims fail for the above reasons, we need not delve into the federal law, related to federal regulations, and state law from other jurisdictions, as well as from Illinois, that the defendant contends warrant speedy trial dismissal in this case. Those cases are simply not relevant to a claim that is unsupported by any facts that show an unreasonable delay. Thus, our *de novo* review of the ultimate question of whether the defendant's right to a speedy trial has been violated (see *Sykes*, 2017 IL App (1st) 150023, ¶ 35) leads us to the firm conclusion that the defendant has failed to meet his burden to "affirmatively show" such a violation. See *id*. ¶ 36.

¶ 84   We note too that although the defendant, in his reply brief, asserts that delays caused by the COVID-19 pandemic are not relevant to the time periods he considers to be unreasonable in this case, the State is correct that if such delays were in dispute in this case, recent case law—with which we agree—holds that general continuances made pursuant to the Illinois Supreme Court's administrative orders regarding the pandemic have the effect of tolling speedy trial computations. *People v. Mayfield*, 2021 IL App (2d) 200603, ¶¶ 4-16.

¶ 85   Because the defendant's third, fourth, and fifth issues raised on appeal all involve purported errors by the trial judge with regard to the admission or exclusion of evidence, we will discuss and analyze these issues together, although we will first describe each contention of error separately. With regard to his third issue raised on appeal—that the trial judge erred when she granted the State's motion to bar evidence of certain phone calls and texts that the defendant maintains should have been admitted—the defendant contends the ruling, taken with the other evidentiary rulings he contests, "deprived [him] of the opportunity to put on a viable defense." He claims the phone call and text evidence was relevant to the question of K.S.'s credibility, and "was more probative than prejudicial." The State responds that there was no reversible error in this case, because there was no clear abuse of discretion in this evidentiary ruling, or in any other evidentiary ruling made by the trial judge. The State adds that it is well-established that a defendant is "not entitled to a new trial based upon evidentiary rulings unless the error was substantially prejudicial and affected the outcome of the case," which the State argues is simply not the case here. Indeed, the State contends that in fact the trial judge did not err at all, because she correctly determined that the phone call and text evidence the defendant wished to introduce was not sufficiently relevant to the charges the defendant faced at trial. The State also notes that the trial judge "did allow evidence of the Snapchat" materials, because she "found the direct exchange between K.S. and [the] defendant to be relevant and material." The State posits that "[t]he admission of this evidence eliminates any

possible prejudice regarding the [excluded evidence] because it allowed [the] defendant to put on evidence of K.S.'s character and argue to the jury that K.S. was playing games with [the] defendant." In reply, the defendant presents no case law, no legal analysis, and no attempt to rebut the State's position that other evidence that was allowed by the trial judge cured any potential prejudice because it allowed the defendant to attempt to impugn K.S.'s character in the same manner he wished to do with the evidence that was excluded; instead, the defendant merely reiterates his contention that the jury should have been allowed to hear the evidence in question.

¶ 86     With regard to his fourth issue raised on appeal—that the trial judge erred when she denied the defendant's motion *in limine* that attempted to bar evidence of his extramarital affairs—the defendant contends that this evidence was prejudicial to him because, he posits, it "cast a prejudicial light on" him. The State responds that it was appropriate for the trial judge to allow limited evidence that the defendant was having an extramarital affair with K.S.'s mother, because it explained for the jury the manner in which the defendant insinuated himself into K.S.'s life, groomed her, and then eventually forced her to have sexual contact with him on multiple occasions. The State further points out that the trial judge found that the fact that K.S.'s mother "had an affair with the defendant went to her credibility on the witness stand, as well as her motive, bias, and interest." The State also suggests that when objecting to this evidence in the trial court, the defendant appeared to be less concerned about the nature of his relationship with K.S.'s mother, and more "concerned about the nude photos of [K.S.'s mother] and other adult women which had been found on defendant's phone." The State again contends there was no clear abuse of the trial judge's discretion in making this ruling, and that accordingly, there was no reversible error. In reply, the defendant presents no case law, no legal analysis, and no attempt to rebut the State's— and the trial court's—position that the evidence was relevant to the credibility of K.S.'s mother as a witness, instead merely reiterating his contention that the evidence was "more prejudicial than

48

probative" and that testimony from K.S.'s foster care caseworker could have been used to explain how the defendant was introduced to K.S.

¶ 87 With regard to his fifth issue raised on appeal—that the trial judge erred when she allowed at trial evidence of one of his extramarital affairs, while denying video evidence and other evidence about K.S. that the defendant wished to introduce—the defendant first incorporates by reference his points from his fourth issue, then adds that he should have been allowed to introduce into evidence the "Facebook video of [K.S.] a week before trial" which he contends "was completely different than her demeanor and how she presented herself in court," and that he should have been allowed to ask K.S. if she had had a child after being sexually assaulted by the defendant, even though the child was not the result of that assault and the father was not alleged to be the defendant. The State responds that it incorporates by reference its argument, in the aforementioned issue, with regard to the evidence of the defendant's affair with K.S.'s mother. The State further argues that there was no clear abuse of discretion in the trial judge's other rulings because the Facebook video, made three years after the defendant sexually assaulted K.S., was not (1) properly disclosed by the defense in discovery, (2) probative in any way of K.S.'s demeanor at the time of the assault three years earlier, or (3) relevant to her demeanor at trial, because, as the trial judge noted, "everyone acts different in a courtroom" than they do when hanging out with their friends. The State contends that the defendant seems to believe that K.S. should not be allowed to heal from the trauma of being sexually assaulted by the defendant, and should at all times appear sad and glum, rather than happy when hanging out with her friends. With regard to the trial judge's ruling barring the defendant from asking K.S. if she later had a child, the State again argues there was no clear abuse of discretion in this ruling, because the evidence the defendant sought to adduce was not relevant or material in any way to the defendant's sexual assault of K.S. In reply, the defendant presents no case law, no legal analysis, and no attempt to rebut the State's position that there was no clear

49

abuse of discretion in this case, instead arguing only that the Facebook video and the fact that K.S. later had a child were matters that went to her "credibility." The defendant does not address the manner in which his own failures—such as his failure to properly disclose the video in discovery in a timely manner, rather than requesting a sidebar about it in the middle of his cross-examination of K.S. at trial—may have contributed to the fact that there was no clear abuse of discretion in this case.

¶ 88    We turn now to the law applicable to the defendant's third, fourth, and fifth issues on appeal. "The determination as to whether evidence is relevant and admissible is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Gonzalez*, 379 Ill. App. 3d 941, 948-49 (2008). As explained above, "[a] trial court abuses its discretion when it acts arbitrarily or where no reasonable person would take its view." *Stoffel*, 389 Ill. App. 3d at 244.

¶ 89    We agree with the State that in this case, there was no error with regard to any of the trial judge's rulings on the defendant's evidentiary claims. As explained in detail below, in analyzing these claims, the trial judge did not act arbitrarily, and we do not believe that "no reasonable person would take [her] view." *Id.* Thus, there was no abuse of discretion with regard to any of these evidentiary rulings. *Gonzalez*, 379 Ill. App. 3d at 948-49. We now address each contention in turn.

¶ 90    With regard to the defendant's third issue on appeal, as explained above, at the outset of the defendant's September 2020 jury trial, the trial judge issued her ruling on the State's July 12, 2018, motion to bar evidence of phone calls (in which, as described above, the State contended that the defendant purported to have evidence, in the form of text messages, that K.S. made a prank call or calls to the defendant's wife), which the trial judge previously had taken under advisement. With regard to the alleged prank call or calls, she ruled that they would not be allowed because they were "not relevant," did not "prove any element of any of the offense[s] or negate any element

50

of any offense," and did not "have any bearing on this case" because they "happened a year after these alleged incidents occur[ed], and after this case has been charged." With regard to the text messages related in time to the call or calls, she ruled that because there were messages directly between K.S. and the defendant, she would allow them to be admitted at trial. We find no error in these rulings, because we agree that the calls were "not relevant," did not "prove any element of any of the offense[s] or negate any element of any offense," and did not "have any bearing on this case" because they "happened a year after these alleged incidents occur[ed], and after this case has been charged," and thus are not, as the defendant claims, "more probative than prejudicial." We note that the State contended in the trial court that K.S. did not even make the "prank" call or calls—her sister did—and contended that K.S.'s texts were to apologize for her sister's mistake. The State is correct that the trial judge "did allow evidence of the Snapchat" materials, because she "found the direct exchange between K.S. and [the] defendant to be relevant and material." We agree with the State that "[t]he admission of this evidence eliminates any possible prejudice regarding the [excluded evidence] because it allowed [the] defendant to put on evidence of K.S.'s character and argue to the jury that K.S. was playing games with [the] defendant." Thus, the defendant was in no way deprived of his ability to present a defense in this case, as he was still able to call into question K.S.'s credibility in front of the jury.

¶ 91 With regard to the defendant's fourth issue on appeal—that the trial judge erred when she denied the defendant's motion *in limine* that attempted to bar evidence of his extramarital affairs—we agree with the State that it was appropriate for the trial judge to allow limited evidence of one such affair, the defendant's affair with K.S.'s mother, because it explained for the jury the manner in which the defendant insinuated himself into K.S.'s life, groomed her, and then eventually forced her to have sexual contact with him on multiple occasions. It is also true, as the State contends, that the trial judge found that the fact that K.S.'s mother "had an affair with the defendant went to

51

her credibility on the witness stand, as well as her motive, bias, and interest." The defendant does not address this aspect of the trial judge's ruling at all. Accordingly, the defendant has forfeited any claim with regard to the trial judge's ruling. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Even if we overlook this forfeiture, and set aside this aspect of the trial judge's ruling, we still agree with the trial judge's reasoning with regard to the relevancy of the defendant's affair with K.S.'s mother in terms of giving a comprehensive context for the jury to understand the nature and extent of the defendant's insinuation of himself into K.S.'s life, as well as his subsequent grooming, sexual abuse, and sexual assaults of her, which could not have been provided in the same way by testimony from K.S.'s foster care caseworker, who had much more limited knowledge of the extent of the interactions between the defendant and K.S. We therefore find the trial judge did not clearly abuse her discretion in making her ruling, because we decline to conclude that no reasonable person would take the view taken by the trial judge in this case. See *Stoffel*, 389 Ill. App. 3d at 244.

¶ 92 With regard to the defendant's fifth issue on appeal, the first sub-issue, regarding allowing K.S.'s mother to testify that she and the defendant had a sexual relationship, has been resolved immediately above. With regard to the second sub-issue, as explained above, during the defendant's cross-examination of K.S. at trial, he requested a sidebar, outside of the presence of the jury, at which he requested permission to play for the jury a copy of a video of K.S. he had obtained from a Facebook account, that was posted approximately one week prior to the trial, because he believed the video showed her to be "not quiet at all like she's portrayed herself" when in the courtroom, and he believed the jury should be able to see the difference in her demeanor, as part of their determination of her credibility as a witness. He conceded that he had not previously

disclosed the video to the State. The State objected, noting that the video appeared to show K.S. "hanging out with her friends, which is a completely different scenario than sitting in a courtroom talking about sexual assault." Counsel for the State then added, "I would not expect her to act the same way she does in a courtroom as with her friends. I don't think anyone in this courtroom would act the same way in the courtroom versus when you're hanging out with your friends."

¶ 93    The trial judge denied the defendant's request to play the video, because "One, it wasn't supplied in discovery. Two, it was filmed a week ago." She added, "We're talking about instances that occurred back in 2017, and you're wanting to play a video of her from a week ago. *** It's not relevant to what happened, whether or not the defendant [sexually assaulted] her or not." She also ruled that "as far as someone's demeanor, I can say everyone in this courtroom acts different because they're in a courtroom. It's a scary place to be. Particularly sitting on the stand talking about a sexual experience." She opined that the defendant's request to play the video was "clearly intended to just smear [K.S.]."

¶ 94    We find no error in the trial judge's rulings. First, the defendant on appeal has not at all contested the trial judge's ruling that the video should be barred because it was not supplied in discovery. Accordingly, the defendant has forfeited any claim with regard to the trial judge's ruling. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Even if we overlook this forfeiture, and set aside the question of compliance with discovery, we still agree with the trial judge's reasoning with regard to the relevancy of the video, and find the trial judge did not clearly abuse her discretion in making her ruling. In light of the lack of relevancy of the video, we decline to find that no reasonable person would take the view taken by the trial judge in this case. See *Stoffel*, 389 Ill. App. 3d at 244.

¶ 95 With regard to the third sub-issue of the defendant's fifth contention on appeal—which is the defendant's argument that he should have been allowed to ask K.S. if she had a child after being sexually assaulted by the defendant, even though the child was not the result of that assault and the father was not alleged to be the defendant—we find no error in the trial judge's ruling on this matter either. As explained above, on June 29, 2020, the State filed an amended motion *in limine*, asking the trial judge to bar, *inter alia*, evidence that while the case was pending, K.S. gave birth to a child. The motion alleged that the father of the child was a juvenile at the time of conception, that no charges were brought against him, and that the birth of the child was irrelevant to the case against the defendant. On July 22, 2020, the trial judge entered an order noting that a hearing had been held that day on the State's amended motion *in limine*, and that the motion was "granted without objection." The defendant has not included a transcript of the hearing, or a bystander's report, in the record on appeal provided to this court, and has not alleged any error in the trial judge's order memorializing that the State's motion was "granted without objection." These failures on the part of the defendant notwithstanding, we agree with the State, and the trial judge, that there was simply no relevance to the fact that K.S. later had a child. As the State aptly notes, the evidence the defendant sought to adduce was not relevant or material in any way to the defendant's sexual assault of K.S. There was no error.

¶ 96 In addition to the foregoing, we conclude that even if we were to assume, merely for the sake of argument, that the trial judge erred with regard to one, or even all, of the defendant's evidentiary claims, the resulting abuse of discretion could not reasonably be said to have resulted "in manifest prejudice to the defendant" (*Gonzalez*, 379 Ill. App. 3d at 949), because of the sheer amount of credible evidence of the defendant's guilt that was properly before the jury, as described above. Thus, for this reason too, there was no error.

54

¶ 97    With regard to the defendant's final issue raised on appeal—that the trial judge erred when she allowed evidence on the charges of child pornography that the defendant was being tried upon—the defendant contends that "[b]ecause the jury heard the evidence of child pornography, [the defendant] was unduly prejudiced by this evidence and the testimony of child pornography affected the outcome of the trial on the [other counts]." The defendant further contends that "the child pornography charges were improperly in front of the jury." The defendant frames the issue as one involving the circumstances under which "other crimes" evidence is admissible, citing only cases that employ an "other crimes" evidence analysis, even though his trial was, in part, literally on the charges of child pornography.

¶ 98    The State responds that once the trial judge denied the defendant's motion to suppress the evidence of child pornography, the defendant had the option to ask the trial judge to sever the child pornography charges from the other counts, but the defendant did not ask the trial judge to do so. The State asserts that the defendant, on appeal, "cannot now complain that the jury saw the nude pictures of K.S. as part of the sexual abuse charges when he never asked to sever the charges," and never moved to exclude the pictures on grounds other than those in his initial motion to dismiss. The State further asserts that it believes that in any event, the pictures were admissible, even on the sexual abuse charges, because the pictures "supported K.S.'s version of the facts, as stated during her CAC interview and her testimony at trial." The State provides precedent in support of its position. In reply, the defendant ignores the fact that he could have moved to sever the charges but did not, and instead argues that the prejudice he alleges that he suffered as a result of the introduction of the pictures "clearly outweighed" their probative value, again relying upon cases employing an "other crimes" evidence analysis to do so.

¶ 99    An exception to the general rule that all relevant evidence is admissible at trial unless otherwise provided by law exists when the State attempts to introduce "evidence of offenses other

than those for which a defendant is being tried." *People v. Cruz*, 162 Ill. 2d 314, 348 (1994). Such evidence is often referred to as "other crimes" evidence. *Id*. at 348-49. In this case, the evidence was clearly not "other crimes" evidence, because it pertained directly to some of the charges being tried, and thus does not fit the definition of evidence of an offense other than those for which the defendant was being tried. Moreover, the defendant has not argued, and could not successfully argue, that the nude photographs of K.S. were not relevant and material to the child pornography charges for which they were introduced into evidence. Indeed, the photographs were necessary for the State to meet its burden to prove that the defendant committed the offenses of child pornography with which he was charged and for which he was being tried. The defendant also has not argued that the photographs were cumulative of other evidence of the offenses, an argument that would have no merit and accordingly would fail as well. Put simply, the photographs were not "other crimes" evidence under the facts and circumstances of this case: they were evidence of some of the offenses for which the defendant was being tried in this case. The defendant did not move to sever the child pornography charges from the other charges, and accordingly cannot now be heard to complain that the trial judge erred by allowing the State to introduce evidence that was directly related to meeting the State's burden to prove the child pornography charges at trial. As with his other issues, there is no merit to the defendant's final issue raised on appeal.

¶ 100                                 III. CONCLUSION

¶ 101   For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 102   Affirmed.